IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff<br>vs<br>JUAN COLON-RODRIGUEZ<br>Defendant | CRIMINAL 07-0507CCC |

# O R D E R

     Defendant Juan Colón-Rodríguez was charged in an Indictment filed on November 16, 2007 (docket entry 2) with several counts of violations to 18 U.S.C. §1014 and one count of a violation of 18 U.S.C. §1844.  The §1014 counts refer to (1) false statements allegedly knowingly made by him on certifications of disaster losses, specifically by overstating the amount of losses sustained as a result of Hurricane Georges by certain farmers who paid him as an independent loan packager at the Farm Service Agency (FSA) to put together their loan applications before that agency, and (2) by allegedly submitting, in connection with the disbursement of emergency loans funds by the FSA, false invoices as to the amount of actual damages suffered by the different several farmers the services listed in the invoices were never performed.  Count 21, the §1344 violation, charges that from September 21, 1998 to December 1, 1999 defendant knowingly and willfully attempted to execute a scheme to defraud the FSA by submitting false information in the manner described above.

     Before the Court is the objection to the guideline calculations raised by defendant Colón-Rodríguez in his Sentencing Memorandum filed on July 6, 2010 (**docket entry 133**).  Specifically, defendant objects to the two-level upward adjustment applied to him in the Pre-Sentence Report (PSR) under U.S.S.G. §3C1.1.  The U.S. Probation Officer based the adjustment on defendant's trial testimony denying that he had falsified invoices which were part of the loan files of the farmers, which directly contradicted the testimony of several government witnesses who stated that they never received nor paid for the services invoiced related to repairs, as well as the evidence establishing that at least one false invoice was

found in his computer.  Defendant insists that all statements made by him during the trial were true and "based on his personal beliefs and knowledge at the time of the trial." Memorandum, at p. 3.  The United States has opposed defendant's objection (docket entry 138), claiming that aside from the instances of purported false testimony regarding the invoices on which the U.S. Probation Officer relied upon to apply the adjustment, defendant also provided material false information during his trial testimony regarding who provided the amounts for the disaster losses included in the loan package for each farmer.  The government has made specific references to the transcript of defendant's trial testimony.

Under the Sentencing Guidelines, an obstruction of justice enhancement is appropriate where a court finds that "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. §3C1.1.  It is firmly established that a sentencing enhancement for obstruction of justice under U.S.S.G. §3C1.1 may be imposed if it is found by a preponderance of the evidence that a defendant has committed perjury.  United States v. González, 609 F.3d 13, 20 (1st Cir. 2010).  A court must find the specific elements of perjury in order to apply the enhancement. Id.  "Perjury means 'false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."'"  Id., quoting United States v. Shinderman, 515 F.3d 5, 19 (1st Cir. 2008).

A review of the Court's notes of all of the trial testimonies establishes that the farmers who sought the assistance of defendant to prepare emergency loan applications submitted to the FSA after Hurricane Georges all paid defendant for his services a percentage of the amount of the entire loan.  Applying for a larger loan required the holding of another meeting in which Colón brought the documents to make the increased loan feasible.  There are specific instances such as the case of farmer Elder Alvarado in which, despite his reluctance, the loan amount requested was increased from the $80,000.00 he actually needed to $160,000.00, at defendant's suggestion.  César Torres' testimony is also evidence of the defendant's efforts to persuade the applicant to ask for a larger FSA loan than intended.  Torres testified that, although he told defendant that he needed

approximately $100,000.00 to finish repairing the farm after the passage of the hurricane, after several meetings in which defendant told him that he could get up to $500,000.00, they agreed to ask for a $300,000.00 loan.

The government's evidence also established that the loan applications submitted by defendant on behalf of the farmers all contained significantly inflated losses that were not suffered by them.  The farmers admitted during their testimony that different items in their Certifications of Disaster Losses regarding losses to crops, equipment, animals and structures either did not occur or were significantly lower.  For example, Elder Alvarado, Exhibit 2(D), referring to a $3,200.00 loss claimed for household goods, testified that he did not have any such loss, that he did not incur in any such loss on an irrigation system for which $19,875.00 were claimed, and that he did not give information regarding those loss amounts to defendant.  He also said that he did not give defendant Colón the numbers that appear in the Certification of Disaster Losses for fences, damages on land and debris removal totaling $10,140.00 and stated that his farm had no fences.  He also indicated that the calculation of total loss at $169,483.00 was inaccurate and that it would be a lot less for the 55 acres that he owned.

Farmer Oscar Rosaly, who also obtained an FSA loan with the paid assistance of defendant, testified that defendant would send blank papers and blank forms with his secretary for him to sign and that all he signed were blank papers.  He testified that he only spent $17,000.00 to repair his wooden house after Hurricane Georges while the Certification of Disaster Losses reflects a claim of $62,000.00 for the dwelling, information that he did not give to defendant or to anyone; that he did not spend the $21,780.00 claimed for furniture and home equipment, but at most $5,000.00 and that he did not give defendant the amounts claimed of $95,965.00 for farm building (poultry barn) and $22,500.00 for a warehouse claim.  He specifically stated that he did not tell defendant that he had a warehouse; that he spent very little money on repairing the ranch and that there was no warehouse to repair. The claim that appears in the form of $64,413.00 for supplies and medicines was also false since he did not lose anything in supplies and he did not give any such information to defendant or anyone else.

Poultry farmer José Ayala-González also applied for an emergency disaster loan from FSA, specifically in the sum of $450,000.00. He, as well as the other farmers, stated that the damage amounts in the Certification of Disaster Losses (Exhibit 6B) were not in his handwriting. Specifically, he testified that the $17,750.00 loss claimed for household and furniture was not accurate; that the total sum of $237,625.00 for damages to a poultry and pig barns and to three warehouses was also inaccurate since he had fixed the poultry barn with an insurance payment of $90,000.00 that he had received, and that he did not give any of those figures to the defendant. He also mentioned that he did not have a watering system for which the sum of $8,485.00 was claimed as a loss; that regarding the $13,220.00 amount claimed for harvested stored crops and livestock products he had no crops and he did not suffer any loss amounting to $13,000.00 for livestock products. Ayala-González also testified that other figures, none of which were given by him to defendant, were all inaccurate, such as the sum of $66,000.00 for fixing fences, $37,640.00 for damages to roads, and $27,565.00 for debris removal.

All of the remaining farmers gave testimonies regarding the false numbers contained in the Certifications of Disaster Losses submitted by defendant as part of their loan applications in the sense that they did not give to defendant the amounts of losses claimed in those forms and that section "H" where the loss amounts were listed were not in their handwriting.

Defendant testified during his direct examination that he would take notes of what farmer Oscar Rosaly told him while they were discussing the figures for his certification of disaster loss and he also stated that he would make estimates. However, during cross-examination he was specifically asked the following:

> Q. Sir, I just want to know what did you do with the numbers you received from Mr. Rosaly?
>
>    Did you give them to someone else?
>
>    Did you make a spreadsheet document?
>
>    Did you do anything with those numbers?
>
> A. I honestly have no answer for that.
>
> Q. So you didn't do anything with those numbers?

      A. Well, obviously, they were put down there.

Transcript of November 18, 2009, p. 134, lines 14 -22.

      Earlier, he had been asked the following about the figures that appeared in Rosaly's certification of disaster losses (Exhibit 3B):

      Q. Do you know how those figures got in that page?

      A. No, I don't.

Tr., p. 27, lines 3-4.

      During his testimony regarding the loan application for José Aponte, specifically about Exhibit 4(b) Section8, the Certificate of Disaster Losses, defendant testified that Mr. Aponte "provided the information . . . he showed pictures and there were several **estimates** that were prepared based on the information that he provided," TR. p. 40, lines 15-17, and further testified that Aponte "sat down with me and provided information . . . he listed the damages that he had, he provided **estimates** of the damages." P. 43, lines 1-4. He never provided any estimates of damages related to Aponte.

      The other fundamental controversy in this case has to do with the invoices. The government not only established through the testimony of each of the farmers that they never received the invoices submitted in evidence, that the services invoiced were not provided but also that they made no payments, yet the invoices are all marked as "paid." See testimonies of government witnesses César Torres-Rodríguez, José Ayala-Rosales, Rogelio Aponte-Ortiz, Miguel Angel Santiago and Lillian Mateo-Schwasenburger. One of the many invoices referred to as the IMR invoices is one for $92,000.00 (Exhibit 2A), made out to farmer Elder Alvarado, which was obtained by the defendant to square away the other $80,000.00 plus the $160,000.00 loan approved for Alvarado. According to the latter's testimony, defendant told him to try to get an invoice from somebody who owed him money, that he refused because it was too large an amount and he could not get anyone to make him such an invoice. He was then instructed by defendant not to do anything that he would call back. He later instructed him to pick up an $85,000.00 check for he had already obtained the invoice needed from a company. Alvarado acknowledged that he never paid IMR the sum of $92,000.00 invoiced for reconstruction of farm fences and a watering system, but the balance of the loan was disbursed and he paid Colón 2% of the entire loan

amount of $160,000.00 after he received the disbursement of $85,459.06.  The IMR invoice for $92,000.00 to Elder Alvarado had a fax header from Agronomics, a company owned by defendant.

Ismael Medina-Rivera is the owner of IMR, Inc., which supposedly issued the IMR invoices.  He testified that he had that business between 1998 and 1999, the relevant period of the indictment, and thereafter it became inactive.  Mr. Rivera-Medina testified that he knows the defendant because they studied together at the University of Puerto Rico.  Regarding the IMR invoice for $92,000.00 for Elder Alvarado (Exhibit 2A), he pointed out that the invoice had his home address in the town of Carolina, Puerto Rico, and that it was faxed from Agronomics, an office that he knew defendant Colón-Rodríguez had and which he also referred to as defendant's DBA.  He also stated that the address for the IMR invoice to Rosaly is a postal address that he had for some time and that the telephone which appears is a home phone he had by November 4, 1999, the date of the invoice. He was shown four IMR invoices, Exhibits 2A, 3C, 7B y 8C, totaling $332,200.00, and categorically stated that neither he nor anyone in his corporation prepared those invoices and that he did not perform services for any of the farmers who were billed by IMR Inc.  See also the testimony of Félix David Zayas, who denied having prepared two invoices that bore his name; and the testimony of Greg Goscha, qualified as an expert in computer forensics, who declared that one of the invoices at issue was found in one of defendant's computers.

Like in Shinderman, "[t[his was no garden-variety testimonial conflict about a peripheral matter but, rather, a head-on clash about a central issue in the case." 515 F.3d at 19.  It is evident that defendant's trial testimony clashed and was irreconcilable with that given by the various government witnesses in several material matters.  We disagree with his self-serving characterization of the government witnesses' testimonies, as we found them to be entirely credible.  His antithetical testimony cannot be justified as being a result of confusion, mistake or faulty memory; defendant, in fact, at the start of cross-examination accepted that he was telling a totally different story and averred that everybody was lying but him.  Thus, we hereby find that his trial testimony was packed with utter falsehoods, willfully made to mislead and misdirect the jury and to obstruct justice.  See United States v. Dunnigan, 507 U.S. 87, 95, 113 S.Ct. 1111, 1116-17 (1993).  Under the standard basis for

the enhancement, material and deliberately false testimony at trial, the testimony of defendant Colón-Rodríguez constituted obstruction of justice which warrants an upward adjustment of two (2) levels pursuant to Section 3C1.1, as correctly applied by the U.S. Probation Officer in the PSR. Accordingly, defendant's sole objection to the PSR is OVERRULED.

SO ORDERED.

At San Juan, Puerto Rico, on September 27, 2010.


                                              S/CARMEN CONSUELO CEREZO
                                              United States District Judge